**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

---

JUAN CARLOS ORTIZ, by his Guardian ad Litem FRANCES SMITH,

      Plaintiff,

v.

NEW JERSEY DIVISION OF YOUTH AND FAMILY SERVICES; GREGORY KELLY; CARLITOS RIVERA; XIOMARA RIVERA; MARY GRAVES a.k.a. MARY PRICE; and MARY ANDERSON,

      Defendants.

Civ. No. 07-4162 (DRD)

**O P I N I O N**

---

*Appearances by:*

JAMES C. DEZAO, Esq.
322 Route 46 West, Suite 120
Parsippany, NJ  07054

  *Attorney for Plaintiff*

ANNE MILGRAM
ATTORNEY GENERAL OF NEW JERSEY
by: Laura A. Carney, Esq.
  Deputy Attorney General
Richard J. Hughes Justice Complex
P.O. Box 116
Trenton, NJ  08625

  *Attorneys for Defendants New Jersey Division of Youth and Family Services, Mary Graves a.k.a. Mary Price, and Mary Anderson*

**DEBEVOISE, Senior District Judge**

Defendants, New Jersey Division of Youth and Family Services ("DYFS"), Mary Graves a.k.a. Mary Price ("Graves"), and Mary Anderson, have moved, pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss the claims against them in Plaintiff's complaint.[1]  Plaintiff, minor Juan Carlos Ortiz, has brought this action through his guardian <u>ad</u> <u>litem</u> and maternal grandmother, Frances Smith.  The ten-count Complaint alleges violations of both state and federal law; however, Juan Carlos's primary claim against DYFS and its two employees, Graves and Anderson (collectively "DYFS Defendants"), is for violations of his substantive due process rights guaranteed by the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

Because a State has no constitutional duty to protect the life, liberty, or property interests of its citizens from deprivation by private actors and Juan Carlos has failed to state a claim for relief under the state-created danger doctrine, the federal claims against the DYFS Defendants will be dismissed.  The Court exercises its discretion pursuant to 28 U.S.C. § 1367(c)(3) to dismiss without prejudice all state law claims against the DYFS Defendants.  Plaintiff has leave to file an amended complaint against the DYFS Defendants within thirty days of the filing of the order implementing this opinion if he can formulate a complaint that states a federal claim.

## I. BACKGROUND

---

[1] Defendants Gregory Kelly, Carlitos Rivera, and Xiomara Rivera have yet to enter an appearance in this action.  After the motion of the DYFS Defendants has been disposed of, the Court will institute proceedings to determine whether the claims against the remaining defendants should be disposed of in a similar manner.

Juan Carlos is the son of Jennifer and Carlitos Rivera. Juan Carlos was born on September 29, 1990. As a young child, Juan Carlos lived with his mother. At some point prior to 1999, Jennifer married Gregory Kelly. Juan Carlos continued to live with his mother and Kelly until Jennifer died in March, 2002. Following Jennifer's death, Juan Carlos went to live with his father, Carlitos, and his wife, Xiomara Rivera, in Paterson, New Jersey. While living with his father, Juan Carlos had regular visits with his maternal grandmother, Francis Smith.

The Complaint alleges that Juan Carlos has been a victim of abuse throughout his young life. (Compl. ¶ 5.) The abuse has been well-documented by DYFS. Between April, 1999, and March, 2002, DYFS received three reports that Kelly had physically abused Juan. Juan Carlos was briefly placed outside of his mother's home after the allegations of abuse were substantiated. (Compl. ¶ 6.) Since April, 2002, DFYS has received five additional reports that Juan Carlos had bruising on his ears and face. (Compl. ¶ 7.) These reports lead to the arrest of Juan's stepmother for endangering the welfare of a child and Juan's father for failing to protect his son. Id.

On August 8, 2003, when Frances Smith picked Juan Carlos up from his father's house for his weekend visit, he appeared extremely underweight and "totally bruised and battered." (Compl. ¶ 9.) Smith observed bruises on Juan's head, face, nose, chest, arms and legs. Id. Juan Carlos told Smith that the bruises were football injuries. Id.

Because of the severity of the bruising, Smith took Juan Carlos to the Emergency Room at St. Joseph's Hospital in Wayne, New Jersey. (Compl. ¶ 10.) The examining doctor, who did not find the bruising to be consistent with the football injuries, referred the matter to DYFS. Id.

Smith alleges that she called DYFS to speak with Graves, Juan Carlos's case worker, on August 11. (Compl. ¶ 11.) Graves was not available, so Smith spoke with Anderson, Graves's

supervisor, who allegedly assured Smith that the matter would be addressed immediately. Id. On the basis of these representations, Smith returned Juan to his father's custody at the end of the weekend. Id.

Graves visited the Rivera home on August 14, 2003. Graves reported that she saw bruising on Juan Carlos and agreed with the assessment that the injuries were not consistent with football injuries. (Compl. ¶ 12.) Graves, however, told Smith that she could not recommend removing Juan Carlos from his father's care, but she did recommend that he be tested for infections or disease due to his sudden and significant weight loss. Id.

On March 31, 2004, Juan Carlos revealed that he had been physically abused by his step-mother, Xiomara Rivera, since he began living with her and his father in April, 2002. (Compl. ¶ 13.) Juan Carlos was then removed from his father's home under a 15-Day Voluntary Consent agreement. Id. During this period, Juan Carlos stayed with his grandmother, but then returned to his father's home at the end of the fifteen days.

On August 29, 2007, Juan Carlos filled a ten count complaint alleging violations of state and federal law by DYFS, Graves, and Anderson and violations of state law by Kelly, Carlitos Rivera, and Xiomara Rivera. Count I is a 42 U.S.C. § 1983 claim which alleges that DYFS deprived Juan Carlos of his substantive due process rights guaranteed by the Fourteenth Amendment. Count II, also a § 1983 claim, alleges that Graves's and Anderson's failure to protect Juan Carlos deprived him of his substantive due process rights. Count III is a § 1983 claim against John Doe defendants for deprivation of Juan Carlos's Fourteenth Amendment rights. Count IV alleges liability against DYFS, Graves, and Anderson under New Jersey's Tort Claims Act, N.J. Stat. Ann. § 59:1-1 et seq. Count V is a claim for punitive damages against

DYFS, Graves, and Anderson.  Count VI is a state law negligence claim against Kelly, Carlitos Rivera, and Xiomara Rivera for breaching their duties of care to Juan Carlos.  Count VII alleges vicarious liability on the part of DYFS for the negligence of Graves, Anderson, and the John Doe defendants.  Count VIII is a state law claim against Kelly and the Riveras for breach of their implied agreement with DYFS to provide reasonable care to Juan Carlos.  Count IX is state law claim for assault, battery, and intentional infliction of emotional distress against Kelly and the Riveras.  Count X is a claim against DYFS, Graves, Anderson, and the John Doe defendants for deprivation of Juan Carlos's substantive due process rights under Article 1, Paragraph 1 of the Constitution of the State of New Jersey.

## II.  DISCUSSION

The DYFS Defendants assert that the Counts I-III and V of Juan Carlos's Complaint should be dismissed because Juan Carlos cannot establish a violation of his federal or statutory rights, as required by 42 U.S.C. § 1983.  They argue that because they had no duty under the Fourteenth Amendment to protect Juan Carlos from the deprivation of his liberty interest at the hands of his step-father, father, or step-mother—all private actors—the Complaint has failed to state a claim upon which relief can be granted.  Juan Carlos argues that he has stated a claim for relief under the state-created danger doctrine.  However, because Juan Carlos has only alleged three of the four elements required by the state-created danger doctrine, he has failed to state a claim for relief.

**A. Standard of Review under Federal Rule of Civil Procedure 12(b)(6)**

Federal Rule of Civil Procedure 12(b)(6) permits a court to dismiss a complaint for failure to state a claim upon which relief can be granted.  When considering a 12(b)(6) motion,

the court must accept the allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 906 (3d Cir. 1997). The inquiry, however, "is not whether plaintiffs will ultimately prevail in a trial on the merits, but whether they should be afforded an opportunity to offer evidence in support of their claims." In re Rockefeller Center Prop., Inc., 311 F.3d 198, 215 (3d Cir. 2002).

The Supreme Court clarified the Rule 12(b)(6) standard in Bell Atlantic Corporation v. Twombly, 127 S.Ct. 1955 (2007). Abrogating the standard established in Conley v. Gibson, 355 U.S. 41, (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim, which would entitle him to relief," the Supreme Court has instructed that "[f]actual allegations must be enough to raise a right to relief above the speculative level." Bell Atlantic, 127 S.Ct. at 1965. Thus, the allegations of the complaint must be enough to "raise a reasonable expectation that discovery will reveal evidence of the necessary element," thereby justifying the advancement of "the case beyond the pleadings to the next stage of litigation." Phillips v. County of Allegheny, 515 F.3d 224 234-35 (3d Cir. 2008).

**B. Section 1983 Causes of Action**

Section 1983 provides a federal cause of action to any person who is deprived of "any rights, privileges, or immunities secured by the Constitution and laws" by another person who is acting under the color of state law. 42 U.S.C. § 1983. Therefore, in order to state a claim for relief under § 1983, a plaintiff must allege that defendants, while acting under color of state law, deprived him of a right secured by the Constitution or federal law. See Gomez v. Toledo, 446 U.S. 635, 640 (1980); Groman v. Township of Manalapan, 47 F.3d 628, 633 (3d Cir. 1995). In

6

this case, Juan Carlos has alleged that the DYFS Defendants deprived him of his substantive due process rights guaranteed by the Due Process Clause of the Fourteenth Amendment by being deliberately indifferent to the risk that Juan Carlos would suffer further abuse at the hands of his step-father, father, and step-mother, and by failing to protect him from such abuse.

**C.  State-Created Danger Doctrine**

The state-created danger doctrine is an exception to the general rule that the "Due Process Clause does not impose an affirmative obligation on the state to protect its citizens" from harms caused by private actors.  Phillips, 515 F.3d at 235 (quoting DeShaney v. Winnebago County Dep't of Social Servs., 489 U.S. 189, 195-96 (1989)).  To state a claim for relief under the state-created danger doctrine, a plaintiff must allege that:

> (1) the harm ultimately caused was foreseeable and fairly direct;
> (2) the state actor acted in willful disregard for the plaintiff's safety;
> (3) there was some relationship between the state and the plaintiff; and
> (4) the state-actor used his authority to create an opportunity for danger that otherwise would not have existed.

Phillips, 515 F.3d at 235 (quoting Bright v. Westmoreland County, 443 F.3d 276, 281 (3d Cir. 2006)).

*(1) Foreseeability and Directness of the Harm Caused*

To properly allege a state-created danger claim, a plaintiff must first "plead that the harm ultimately caused was a foreseeable and fairly direct result of the state's actions."  Phillips, 515 F.3d at 237 (quoting Morse v. Lower Merion School Dist., 132 F.3d 902, 908 (3d Cir. 1997)).  To adequately plead foreseeability, a plaintiff must "allege an awareness on the part of the state actors that rises to [the] level of actual knowledge or an awareness of risk that is sufficiently concrete to put the actors on notice of the harm."  Id. at 238.

7

In this case, the harm ultimately caused was the continued abuse of Juan Carlos at the hands of his father and step-mother. The Complaint alleges that as a result of the DYFS Defendants' failure to remove Juan Carlos from his father's home, he was subjected to further abuse. The Complaint also alleges that the harm was foreseeable because the DYFS Defendants were aware that Juan Carlos was being abused by his father or step-mother as early as August, 2003, and that the harm was a fairly direct result of the DYFS Defendants' failure to act because it could have been prevented by Juan Carlos's removal from his father's home. Thus, the first element has been properly alleged.

### *(2) Willful Disregard for Safety*

To act with willful disregard for the plaintiff's safety is to act with "a degree of culpability that shocks the conscience." Phillips, 515 F.3d at 240 (quoting Bright, 443 F.3d at 281). When determining the degree of culpability, the "time in which the government actors had to respond to an incident is of particular significance." Id. Namely, the "level of culpability required to shock the conscience increases as the time state actors have to deliberate decreases." Id. (quoting Stanford v. Stiles, 456 F.3d 298, 306 (3d Cir. 2006)). Actors in a "hyperpressurized environment" are given more leeway in their decision-making than officials who are "afforded the luxury of a greater degree of deliberation and have time to make unhurried judgments."

In this case, the allegations of the Complaint suggest that the DYFS Defendants were not acting in a hyperpressurized environment; but rather in a situation where they had sufficient time to proceed deliberately. Indeed, when DYFS received the report from the emergency room physician, Juan Carlos was out of his father's house and in Smith's care. Because the DYFS Defendants had time to make unhurried judgments, allegations of their "deliberate indifference to

the results of their actions" are sufficient to establish a level of culpability that shocks the conscience. Phillips, 515 F.3d at 241.

The Complaint has sufficiently alleged that the DYFS Defendants' were deliberately indifference to the continued abuse of Juan Carlos. Not only were the DYFS Defendants aware that Juan Carlos was being abused by his father or step-mother, they took no action to prevent it. Thus, the second element has been properly alleged.

### (3) Some Relationship

The plaintiff must also allege that some relationship existed between himself and the state. Phillips, 515 F.3d at 242. This relationship requirement merely "contemplates some contact such that the plaintiff was a foreseeable victim of the defendant's acts in a tort sense"; it does not require a plaintiff to "plead facts that show . . . [a] 'special relationship' basis for constitutional liability." Id. (quoting Morse, 132 F.3d at 912). Thus, the requisite relationship can be established by showing that "the plaintiff was a foreseeable victim, individually or as a member of a discrete class." Id. (citing Rivas v. City of Passaic, 365 F.3d 181, 202 (3d Cir. 2004)).

There is no question that some relationship existed between Juan Carlos and the DYFS Defendants because Juan Carlos was a foreseeable victim of the DYFS Defendants' failure to act to remove him from his father's home. The Complaint alleges that DYFS received five reports regarding Juan Carlos since he began living with his father and step-mother in April, 2002, and that the reports of abuse have been substantiated. The Complaint further alleges that Graves declined to recommend removal of Juan Carlos from his father's home, even though she believed that he had suffered abuse and it was likely that he would be subjected to further abuse. Thus,

the third element has been properly alleged.

### (4) An Affirmative Act

Finally, to properly allege a state-created danger claim, the plaintiff must allege that "a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all." Bright v. Westmoreland County, 443 F.3d 276, 281 (3d Cir. 2006). As explained in Bright, this means that liability under the state-created danger doctrine is "predicated upon the states' affirmative acts which work to the plaintiff's detriment in terms of exposure to danger. It is the misuse of state authority, rather than a failure to use it, that can violate the Due Process Clause." 443 F.3d at 282 (emphasis added). Although the Court of Appeals has acknowledged that the line between action and inaction may not always be clear, the Court of Appeals has "never found a state-created danger claim to be meritorious without an allegation and subsequent showing that state authority was affirmatively exercised in some fashion." Phillips, 515 F.3d at 236. Allegations that the State merely failed to take action to protect an individual against private action do not state a claim for relief under the Due Process Clause.[2]  See Bright, 443 F.3d at 284.

Indeed in Bennett v. City of Philadelphia, 499 F.3d 281 (3d Cir. 2007), the Court of

---

[2] The failure to act only constitutes an affirmative act when there is a duty to act. In the substantive due process context, the State has no constitutional duty to act to protect a child when the child is not in the State's custody. See DeShaney, 489 U.S. at 200. Neither "the State's knowledge of the individual's predicament," Bright, 43 F.3d at 284, nor the fact that a State once took temporary custody of the child, DeShaney, 489 U.S. at 200, give rise to an affirmative duty to act on the part of the State. Even an assurance to act "cannot form the basis of a state-created danger claim." Ye v. United States, 484 F.3d 634, 640 (3d Cir. 2007). "Liability requires affirmative state action; mere failure to protect an individual against private violence does not violate the Due Process Clause." Bright, 443 F.3d at 284 (citing DeShaney, 489 U.S. at 197, 200).

Appeals affirmed a grant of summary judgment in favor of the state defendants because the plaintiffs had failed to establish that a state actor had affirmatively used his or her authority to render any of them more vulnerable to danger than had the state not acted at all.  499 F.3d at 288. The plaintiffs in Bennett were three sisters and the estate of a fourth sister who filed 42 U.S.C. § 1983 claims against the City of Philadelphia, the Philadelphia Department of Human Services ("DHS"), its Director, and several social workers, claiming violations of their due process rights under the state-created danger doctrine.  Id. at 286.

In the Bennett sisters' case, DHS had determined that the mother posed a serious risk of harm to the children and a family court had ordered DHS supervision of two of the Bennett girls. Bennett, 499 F.3d at 283.  When DHS was unable to locate the family, it petitioned the family court for discharge of DHS supervision.  The judge refused to grant the petition and ordered DHS to vigilantly look for one of the Bennett girls and take her into DHS custody.  Id. at 284. However, the Bennett children were never taken into custody and the case was eventually discharged by DHS because the family could not be located.  Id.  Three years later the Bennett sisters resurfaced.  DHS received reports that the girls had been beaten by their babysitter, a convicted child sex offender who suffered from a schizoaffective bipolar type disorder and had a history of drug and alcohol abuse.  Id.  A DHS social worker was assigned to the case and required to investigate the incident; but no contact with the Bennett sisters was ever made.  Id. at 285.  Three days later one of the Bennett sisters was brutally beaten and taken by emergency personnel to a hospital where she was pronounced dead shortly after arrival.  Id.  The other three sisters were admitted to the hospital and diagnosed with child abuse.

The Bennett sisters asserted that DHS acted affirmatively by closing their dependency

case, which rendered them more vulnerable to harm by their mother and her acquaintances. Bennett, 499. F.3d at 289.  The Court of Appeals rejected this as an affirmative act that made the girls more vulnerable to danger because DHS remained free to search for the girls even though their case was closed.  Id.  The Court of Appeals also determined that the DHS social worker's specific request to be assigned to the Bennett sisters' case and subsequent failure to adequately investigate the abuse report did not constitute an affirmative act because the social worker's actions did not result in the creation of dangers by the state because the danger already existed. Id.  Finding no allegations of an affirmative act on the part of the state actors that would support the use of the state-created danger doctrine, the Court of Appeals affirmed the grant of summary judgment.

Similarly in DeShaney v. Winnebago County Department of Social Services, 489 U.S. 189 (1989), the Supreme Court refused to find that the Winnebago County Department of Social Services ("DSS") had violated the Due Process Clause of the Fourteenth Amendment when social workers failed to remove a child from the custody of his father.  DSS had received reports that the father was abusing his child; but DSS did not pursue the reports further because the father denied the accusations.  Id. at 192.  The child was eventually placed in temporary custody after he was admitted to a local hospital with multiple bruises and abrasions; but the child was returned to his father after it was decided that there was insufficient evidence of child abuse.  Id. A month later, DSS was again notified by emergency room personnel that the child was being treated for suspicious injuries; but still DSS took no action.  Id.  On visits to the DeShaney home, the DSS caseworker observed that the child had suspicious injuries and noted in her reports that someone in the home was probably abusing the child; but still DSS took no further action.  Id. at

193. DSS was notified a third time by emergency room personnel that the child was treated for injuries believed to be caused by child abuse and on the follow-up visits, the case worker was unable to see the child; but still DSS to no action. Id. A few months later, the four-year old child was beaten so severely that he fell into a life-threatening coma. Id.

The Supreme Court refused to impose liability on the state actors for the child's injuries because it found that "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." DeShaney, 489 U.S. at 196. The Supreme Court conceded that "in certain limited circumstances the Constitution imposes upon the State affirmative duties of care and protection with respect to particular individuals." Id. at 198. However, those circumstances only arise "when the State takes a person into custody." Id. at 199. Thus, in the substantive due process analysis, a State must take some affirmative act that "restrain[s] an individual's freedom to act on his own behalf" in order to cause a deprivation of liberty that "trigger[s] the protections of the Due Process Clause." Id. at 200. If the State takes no affirmative action to restrain an individual's freedom, then it has no constitutional obligation to protect the individual's liberty interests from deprivation or harms inflicted by private actors. See id.

The jurisprudence of the Supreme Court and the Court of Appeals therefore requires that a plaintiff "allege an affirmative action, rather than inaction or omission" in order to state a claim for relief under the state-created danger doctrine. Phillips, 515 F.3d at 236. In this case, Juan Carlos has pointed to no affirmative action by DYFS, Graves, or Anderson that rendered him more vulnerable to harm. Although the complaint contains allegations that some relationship existed between Juan Carlos and DYFS; that DYFS knew or should have known that he would

suffer further abuse at the hands the Riveras; and that DYFS, Graves, and Anderson were deliberately indifferent to the risk of further abuse, the Complaint has failed to present allegations that raise a reasonable expectation that DYFS, Graves, or Anderson used their authority to create an opportunity for Juan Carlos to be abused that would not have existed but-for their actions. See Bennett, 499 F.3d 281, 289 (3d Cir. 2007).  Because the Complaint only contains allegations of the DYFS Defendants' omissions, and no allegations of affirmative actions, the fourth element of the state-created danger doctrine has not been properly pleaded.

Because Juan Carlos has only sufficiently alleged three of the four elements required by the state-created danger doctrine, his § 1983 claims for violations of his substantive due process rights against the DYFS Defendants must be dismissed.[3]  Consequently, Juan Carlos's claim for punitive damages, which was premised on the actions of the DYFS Defendants, must also be dismissed.  Despite this ruling, Juan Carlos must be afforded an opportunity to amend his complaint.  See Phillips, 515 F.3d at 236.  Therefore Juan Carlos has thirty days in which to file an amended complaint which properly alleges an affirmative act by the DYFS Defendants.  If no amended complaint is filed within thirty days of the entry of the order implementing this opinion, then the Complaint against the DYFS Defendants will be deemed dismissed.

D.  Remaining State Law Claims

If no amended complaint is filed, and the federal claims against the DYFS Defendants are

---

[3] The Plaintiff, in opposition to the DYFS Defendants' motion to dismiss, argues that federal claims cannot be barred by the tort law of the State of New Jersey.  However, Plaintiff's argument misreads the DYFS Defendants' position.  The DYFS Defendants do not assert that Juan Carlos's federal claims are barred by the TCA; rather, they are arguing that the TCA provides them with immunity on Juan Carlos's state law claims.

dismissed, the Court, pursuant to 28 U.S.C. § 1367(c)(3), will decline to exercise supplemental jurisdiction over the remaining state law claims against the DYFS Defendants.

### III.  CONCLUSION

The Court will file an order implementing this opinion.


/s/ Dickinson R. Debevoise
DICKINSON R. DEBEVOISE, U.S.S.D.J.


Dated: April 15, 2008